**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

CAITLIN SANCHEZ, performing as         10 Civ. 7854 (TPG)
"DORA THE EXPLORER,"

                       **Plaintiff,**          **DECLARATION OF HILDA**
                                     **SANCHEZ SUPPORTING MOTION**
  -against-                              **TO VACATE DISMISSAL &**
                                     **SETTLEMENT & DISGORGE**
**MTV NETWORKS, a division of**       **FEES FROM JOHN BALESTRIERE**
**Viacom, International, Inc., d/b/a NICKELODEON,**
**AND NICKELODEON/VIACOM**
**CONSUMER PRODUCTS, INC.**
                         **Defendants.**
-------------------------------------------------------------------X

      Hilda Sanchez, certifies as follows:

1.   I am the mother of Plaintiff Caitlin Sanchez. She is presently 15 years old.  For about 5 years, Caitlin was the voice and personality of the Nickelodeon series "Dora the Explorer." In about 2010 we suspected that Nickelodeon was not paying Caitlin in full for her services, so we wanted a forensic accounting of Nickelodeon. Our suspicions were based upon Nickelodeon publicizing that the "Dora" franchise made billions of dollars (**Exhibit "A"**).

2.   On or about August 6, 2010, Caitlin and I met and consulted with attorney John Balestriere. We informed him that we wanted (a) discovery of Nickelodeon's accounting and profits and (b) a "net profits" case, (c) to hire an expert to analyze their books, records and accounting, including a theory of "vertical integration" which is a form of creative accounting in the entertainment industry where a company claims they spend money on other companies to claim losses to make their profits appear lower, when they are actually related companies,(d) claims that their contracts were unconscionable and (e) include in the suit Caitlin's management company, Cunningham, Escott, Slevin, Doherty  ("CESD").

3.   John Balestriere advised us that Nickelodeon owed Caitlin Millions of Dollars. On September 30, 2010 he contacted the media to publicize Caitlin's plight to gain notoriety for himself.  In a September 30, 2010 e-mail to me he states, "If we file, I actually believe that a week from Tuesday is best since it will be after the holiday weekend when, bluntly, there would be more media exposure of the filing **(I've contacted people at the News and the Times to let them know I MAY have a case, if we want to go that way).**"( emphasis added).  On October, 1, 2010, he sent a demand letter to Nickelodeon for Millions of

Dollars.1 On October 6, 2010, he filed a complaint in New York State court alleging Caitlin was defrauded from millions of dollars. He does not name her agent CESD as a party, nor does he allege an accounting which was the allegation we wanted. Defendants removed the case to this District Court (PACER filings 1,3).

4.  John Balestriere never sent us communications between him and other counsel or this court, pleadings, motions, orders or anything filed with this Court other than the initial complaint. We had no idea what was filed until our present counsel obtained the PACER filings and docket to review with us (**Exhibit "B"),**.

5.   The docket shows discovery was stayed and within less than a month Caitlin's case was settled. The settlement was nowhere near the tens of Millions of Dollars Mr. Balestriere represented was due Caitlin in his demand letters and his complaint filed with this court. There was no discovery and no lawsuit against CESD.

6.  I believe it was a material fraud upon this Court when Mr. Balestriere later settled with CESD on Caitlin's behalf without this court's approval or oversight. Also, to prevent us from informing this Court of our objection to  settlement, on November 11, 2010, John Balestriere e-mailed me that this court's approval of an infant's compromise is not required (**Exhibit "C").** If this Court would have held a hearing on the infant's compromise and received the proper filing from John Balestriere according to the Infant's Compromise laws2, then we would have informed this court that he threatened us to settle or we lose everything and pay him some $300,000 that we did not have.

**7.**  During this brief one month docket, Mr. Balestriere informed me that he was subject to sanctions, including for his misconduct in publicizing confidential information about Viacom and Caitlin around September 30, 2010.  I now understand the complaint he filed was improper as he never alleged an accounting cause of action nor included CESD as a necessary party. Also, he listed non-lawyer, Angie J. Chrysler, on the federal pleadings and had clerks and non-lawyers giving us legal advice.

**8.**  Soon after sanctions was an issue, in early November Mr. Balestriere pushed settlement On November 3 and 9, 2010, I e-mailed our position that we would not settle, as follows:

1 Because of the confidential settlement presently in place I cannot state the exact inordinate demand amount, but since the complaint is public and it does state Millions of Dollars are due, I am not stating anything that is not already public.

2 See our present counsel's, Susan Chana Lask, Esq, June 25, 2011Memorandum of Law submitted herewith explaining the laws.

"I will not settle for what they are offering; Caitlin would have have (sic) made (REDACTED) so we cannot accept that offer we need to continue to litigate and they have to (REDACTED) we will continue to litigate."

"Our thoughts on this settlement proposal is: absolutely not. We simply do not agree with any of these terms and do not wish to settle with them at all. I want to continue litigation and go on to arbitration if the court demands it. We do not wish to further discuss any settlement offers from Nickelodeon and wish to just continue the case as planned. Please provide me with the
(REDACTED) Agreements when you receive them.
 Thanks,
 Hilda"

John:
It's not that I have concerns of the settlement offer, I understand it fully, it is just not what we want. We don't want to spend anymore time or energy on this settlement offer, we want to spend our time and energy on preparing for arbitration (if the court demands it).
Sorry, but I'm not available this week at all, perhaps next week I'll try to find time - but we don't have to discuss the settlement further. I completely understand it and everything you said before and I am aware of all the risks, but we made our decision to continue to pursue resolution through jury or arbitrator.
Just keep me updated on the status of our motion to remand to state court and also the status of the amended complaint.
Thanks,
Hilda

9.     Mr. Balestriere bombarded us with convoluted and incomprehensible long-winded e-mails demanding we settle and concealed from this Court our settlement objections and that we wanted discovery and an accounting.  He never informed this court that he took more than an attorney-client interest in Caitlin's case by including terms in his August 26, 2010 retainer attaching himself at 37.5% to her royalties and future royalties as if he was her talent agent.

10.    Mr. Balestriere had us sign two retainer agreements of August 6 and then the 26th, 2010 (**Exhibits "D" and "E"**). I now understand that his August 26, 2010 retainer resulted after he realized he could exploit Caitlin's future royalties with terms literally attaching him to everything she was due in the future from her work in the Dora brand. That retainer also included excessive fees and a contingency arrangement never disclosed to this Court for approval pursuant to the Infant's Compromise laws, as follows:

p.1- He had the "exclusive right to represent Caitlin" as if he is Caitlin's "agent", not her attorney as he later pushed her talent agent CESD out of their 10% fees and Mr. Balestriere insisted those fees come to him—all without this Court's approval;

p 2- he had this term "success fee" which by his definition was hard to understand other than he is taking everything from Caitlin's employment as an actress as if he is in business with her,

3

not acting as her attorney as he defines it as "The Recovery is defined as **a cash recovery or anything of value, or any other service or thing of value of any kind, from any source,** including, without limitation, (a) any purchase or purchase rights of any **assets, licensing agreements, or any business transactions or goodwill which have any value of any kind;** (b) restitution from any source, including a government source, if our Firm has, prior to the payment of restitution, had any contact of any kind with the source; (c) reduction of any amount of any debt or any financing obligations of any kind; or (d) attorney's fees and costs, from any party, whether from actual litigation, negotiation, arbitration, advocacy, consultation, or otherwise, including, but not limited to, by way of court order or any agreement."

-His "success fee" was at 35% before discovery and 37.5% after any discovery of any kind, yet in this case he took 37.5% of the Caitlin's settlement funds when there was a November 8, 2010 court ordered stay on discovery (PACER 15);

-p. 2-states all fees go into trust account then he pays himself but we doubt he put anything into a trust account as he immediately took his 37.5% when he got control of the settlement check;

p3- shows we paid $10,000 and $5,000 that he claims he put in a trust account is $1,000 against expenses and later he bills us $3,547.04 on December 10, 2010 for outrageous, almost daily meals and cabs for him and his staff, including some $1,000 for some woman who did nothing for our case (see **Exhibit G**);

-pp 3-4 he has hourly increases without notice of increase, and fees presently at Senior Attorney- $620-755/hr, Of Counsel and mid-level attorneys $440 - $570/hr, Other attorney, law clerks, and apprentices $205 - $560/hour; Analysts $210 - $240/hour which we later discovered the people he was billing us for at those outrageous rates were not licensed attorneys and unnecessary to our case, no less how could he justify his $755 rate when he is not even practicing for more than 11 years and not an entertainment attorney;

-p.4- he agrees to promptly notify of any settlement offer and "If, however, you instruct the Firm to settle contrary to the advice of the Firm, **the Firm will be entitled, at its sole option,** to the greater of (i) a fee calculated in accordance with the percentages set forth in the Success or Share of the Recovery Fee paragraph above, applied to the amount of **$250,000**, or (ii) its attorneys' fees, (including its fees for the services of any employees or affiliates of the Firm calculated at the Firm's non-discounted hourly rates, as well as reimbursement for all costs (including expenses) advanced before the settlement). **The Firm will not settle your claim without your approval**. Subject to the foregoing, you shall have the absolute right to accept or reject any settlement.", yet when we objected to the low settlement and terms of it he presented to us around November 10, 2010, he threatened he was abandoning Caitlin's case, she was going to lose and that we would have to pay him some $300,000. He completely ignored our requests to at least negotiate settlement terms and this paragraph forces us to either settle or he gets $250,000 no matter what.

-p.5 –here he makes the Caitlin pay for attorney and staff meals, overtime, clerical costs, car service after 9 pm and somehow he racked up a December 10, 2010 bill of over $3,000.00 on this charges that were absolutely unnecessary, unconscionable and exploitive. I want to see the proof how some $3,000 of meals and cabs was incurred here.

-p.5 -late charges of 1% due if payment is past 10 days due but I understand now he should give us at least 30 days;

-pp.5-6 he holds Caitlin responsible for $50,000 in liquidated damages to him if she posts anything on-line about his firm representing her, which not only do I now understand he is holding her in conflict with him at the outset of his representation for "damages" due her own attorney but he actually violated this term by his immediately posting on-line and contacting the media about Caitlin and her case to gain notoriety for himself. He should pay Caitlin $50,000 or this Court should scrutinize why an attorney holds their own client liable to them for $50,000 in damages on such a term at the outset of the retainer;

- p.8 demands that the client "should NOT engage us unless you are prepared to go the distance in this matter and push the case to arbitration or trial", yet John Balestriere abandoned our case immediately when we demanded he go the "distance". I now realize this is part of his puffery to convince us as he did when we initially met him that he is a fighter and he takes his cases to trial and will not give up. He immediately dropped this case in a month and threatened if we do not settle at his terms we will pay him some $300,000.

- p.8-mandates that he decides all public relations, the client has no right in this process and he makes her agree that he has the "right to publicize or otherwise distribute public information regarding the matter." This unilateral term is not only unfair but he is acting as if he is in business with her as her agent not as an attorney. And he did publicize this case to her detriment, to the point the media was so disgusted with John Balestriere mishandling Caitlin that even Perez Hilton reported on October 18, 2010 entitled "**Dora Needs A New Lawyer!**" that "The lawyer for *Dora the Explorer*'s voice actress, Caitlin Sanchez seems like a total scumbag!" and "he's resorted to using shady tactics to get Nickelodeon to cave, such as threatening to humiliate the network by exposing some unflattering secrets and allowing Caitlin to go on talk shows and dish out the dirt." (**Exhibit "F"**). That report occurred because John Balestriere publicized Caitlin's case for his own notoriety to her detriment by using threats, including a RICO action against Nickelodeon that Mr. Balestriere informed me he would be sanctioned for his misconduct.

-p-8 he has her indemnify him from all third party suits and limits her to only state court actions which is another of his many restrictions on her rights to simply have legal representation, not at the outset give John Balestriere exclusive rights over her career and being indebted to him for liquidated damages or putting her into a contingency agreement that he can abandon her at any time if she does not settle, then be indebted to him for over $250,000 in a matter of a few months.

11.     Despite the retainer promising not to settle without our approval, John Balestriere yelled at us and threatened us that we would lose the case and have to pay him some $300,000 if we did not settle as he directed. Under his threats, on November 15, 2010 Caitlin and I went to his office. Caitlin's father Kevin refused to go because he objected to the settlement. John Balestriere did not provide the exhibits that his settlement agreement referred to. I requested to see those documents and asked for his advice regarding their impact since

November 12, 2010, but he ignored my requests.  In my November 12, 2010 e-mail to John

Balestriere I stated:

> **Caitlin Sanchez <redacted> Fri, Nov 12, 2010 at 6:29 PM**
> To: john.balestriere@balestriere.net, laura.sayler@balestriere.net,
> angie.chrysler@balestriere.net
> John, Laura & Angie:
>
> Okay, thanks, we'll review these documents over the weekend.
> I need the following documents sent to me:
>
> * Exhibit A in the AFTRA National Code of Fair Practice for Network Television
> Broadcasting known as "The WB/UPN Supplement Agreement 2004-2007"
> * Exhibit A in the AFTRA National Code of Fair Practice for Network Television
> Broadcasting known as "The CW Supplement Agreement 2007-2010"
> * The AFTRA-Uptown Agreement from 2002
> * The AFTRA National Code of Fair Practice for Network Television Broadcasting from
> 2004-2007
>
> Please get me those documents so I can review over the weekend.
> Thanks,
> Hilda

12.     Mr. Balestriere e-mailed that he did not have the exhibits, to wit:

> **John G. Balestriere <john.balestriere@balestriere.net> Fri, Nov 12, 2010 at 6:33
> PM**
> Reply-To: john.balestriere@balestriere.net
> To: Caitlin Sanchez <REDACTED>
> c: laura.sayler@balestriere.net, angie.chrysler@balestriere.net
>
> Hilda:
> I'm not sure if we have all of these, but we'll send what we do, and I'll simply request
> right now that Kauff send all of them to us. Once I get them from him, I'll forward on to
> you.
> Just consistent with my last e-mail - while I'd like to wrap this up on Monday morning,
> I'm figuring it may be another day. Again, we'll talk, and please keep Monday morning
> open, but we may need to do this on Tuesday.
> Thanks,
> John

He was not concerned if we had the collective bargaining agreements before settling, if we

understood them or if Nickelodeon violated the terms of the collective bargaining

agreements. Later, as explained hereinbelow, on December 12 he then advises we should

sue nickelodeon if they violated the very agreements he withheld from us.

13.     We had no idea what the terms of those pertinent exhibits were.  He had us sign the

settlement signature pages at his office on November 15, 2010 without the exhibits nor an

explanation of what they were and without a complete settlement document to review and

understand.  The exhibits were pertinent as they determined Caitlin's rights to pay and how

much she should get and whether those documents were legal and how they impacted Caitlin's claim to an accounting of Nickelodeon, which was the entire basis of this case.

14.    On November 15, 2010, John Balestriere notarized my signature and Caitlin's. We recently discovered he falsely notarized Kevin's signature when Kevin never appeared before him, and he submitted that false notary to this Court (see **6/25/11 Kevin Sanchez Cert.**). After Caitlin and I signed the signature pages and as we were leaving his office, a woman named Laura Sayler, whom John Balestriere refers to as an "analyst" at his office, handed me the exhibits I had been requesting, including the AFTRA agreement.

15.    The November 15, 2010 Affidavit of John. G. Balestriere filed with this court is false as he states he reviewed and explained documents he never had nor provided when requested, and only provided <u>after</u> we signed the signature pages**.**

16.    John Balestriere knew we objected to the settlement, but to placate us into signing what we objected to and to mislead us into signing the Nickelodeon settlement while on the side he was settling with CESD as leverage for more fees for himself, he told us it was not final and we could still sue Nickelodeon because the settlement was "just a first step, and this is a victory".  As proof of his false representations that the settlement was not final and we can continue litigation, on December 8, 2010, after the Nickelodeon settlement was submitted to this court, he confirms we can still sue Nickelodeon in his below convoluted e-mail:

> John G. Balestriere
> john.balestriere@balestriere.net Wed, Dec 8, 2010 at 11:37 PM
> To: Caitlin Sanchez <REDACTED>
> Cc: "laura.sayler@balestriere.net" <laura.sayler@balestriere.net>,
> "angie.chrysler@balestriere.net" <angie.chrysler@balestriere.net>
> Hilda:
> From what we can tell, the contracts are valid. We followed up with AFTRA and still need to find out more about exclusivity, but **if there was abuse there, then, again, that's something for which we'd need to go after Nickelodeon.**
> **The Nickelodeon settlement does not in any way provide for a reduction in Caitlin's share**. However the settlement is supposed to include merchandising and residuals which do often have the "+10%" provision. In fact, we want as much of that as possible: the more CESD is getting simply because they have previously been Caitlin's agents, then the more that they are now promising to turn over to us.
> I'll follow up with their defense counsel re settlement so we can get the ball rolling re an agreement.

17.    On January 11, 2011 we directed John Balestriere to stay away from our case and anyone connected with Caitlin (see **6/25/11 Kevin Sanchez Cert.**). John Balestriere refused to return our file and threatened us with more bills, including over $12,000 in fees and an over $3,000 in disbursements consisting of almost daily meals and cabs for himself that he claimed was related

to this case **(Exhibit "G"). N**one of those fees were approved by this Court pursuant to the Infant's Compromise laws.  Also, this Court never approved his retainer and taking 37.5% of Caitlin's settlement and his settling on the side with CESD nor his continued interference with CESD by demanding Caitlin's monies go to him even after we terminated him on January 11, 2011(**Exhibit "H"**).

18. From January, 2011 through May, 2011, John Balestriere continued to interfere with Caitlin's business despite his being terminated for cause in January, 2011. Nickelodeon agreed to amend the Settlement to remove Mr. Balestriere from any notice provisions therein so we received all notices, yet when the amendment was sent to Mr. Balestriere to sign, he sent another of his threatening and intimidating responses to let us know he would continue to interfere with Caitlin's business and payments despite our wish that he stay away from us, to wit:

> 5/18/11 1:26 PM
> angie.chrysler@balestriere.net
>
> Jerry and Hilda:
>
> I wish to repeat my statements below and reiterate I reserve all rights on behalf of Balestriere Fariello.
>
> Moreover, and, regrettably, based on recent communications with Hilda and Kevin Sanchez, I am forced to states that I shall not execute any amendment to the settlement agreement. Based on recent communications, I do not anticipate my position changing regarding this. As such, as a matter of contract law, UPI, as defined in the settlement agreement, remains obligated to provide this firm with any notices and payments as memorialized in the settlement agreement.
> John

19. John Balestriere confused us so much regarding the settlement and denied explaining our rights and misrepresented facts and the law that we believe money that is due Caitlin is missing because Mr. Balestriere interfered with monies due Caitlin. If he would have followed the Infant's Compromise laws by delineating his fees and what he obtained and took therefrom, included CESD in this action and explained in his papers how the settlement was calculated and reached, then this Court would have had the proper oversight to prevent Mr. Balestriere's misconduct, threats and intimidation tactics towards Caitlin.

20. Now Caitlin has a $106,000 tax liability because Mr. Balestriere failed to have the settlement payments attributed as royalties.  That liability zeroes out what little settlement Mr. Balestriere gave to Caitlin after he took his excessive fees and disbursements never approved by this Court. If this Court was not duped by Mr. Balestriere's settlement papers that avoided our appearance

before this court that Infant's Compromise laws provide for, then this tax consequence and all of Mr. balestriere's frauds could have been avoided.

21.    The settlement Mr. Balestriere obtained was actually royalty money already due Caitlin pursuant to her existing contract with Nickelodeon. That is confirmed by the Settlement agreement's paragraphs 5(a) and (b)3. So not only does this Court not realize he only obtained for this child what she was due anyhow, but he took 37.5% of the money she was due. He added nothing to Caitlin's rights but did exactly the opposite by exploiting her so he can take a chunk of her fees. Worse, since the settlement money was merchandise and residual payments from her contracts, then it is a royalty from her net-profit deal with Nickelodeon, not wages. Our accountant explained that as royalties it is not subject to the Alternative Minimum Tax. Since it's not subject to the Alternative Minimum Tax, it would allow her to deduct expenses to significantly lower her tax burden; but because John Balestriere did not explain these issues to the court, Caitlin is subjected to huge tax liabilities.

22.    Nickelodeon was willing to immediately correct this tax issue. John Balestriere refused to cooperate. He wanted Caitlin to loan him the money to return to Nickelodeon (**Exhibit "I"**). The tax issue alone mandates this Court's help at this point correct Mr. Balestreire's abuses as Caitlin is left with nothing compared to John Balestriere profiting from a settlement ignoring the Infant's Compromise laws. Notwithstanding the tax issue, John Balestriere's broad pattern of misconduct in this Infant's Compromise mandates this Court's intervention.

23.    If this Court was not deceived by Mr. Balestriere, Caitlin's interests would have been protected, not abuse by an attorney who falsified a notary, used non-lawyers on legal pleadings filed with the court and prevented us access to the case so he could manipulate the settlement.

24.    Caitlin deserves this Court to scrutinize what occurred, review in detail the settlement according to the Infant's Compromise laws, disgorge John Balestriere's excessive fees and vacate the dismissal and settlement so we can obtain the true value of this case for this child by the discovery that John Balestriere refused to obtain.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  June 25, 2011

**HILDA SANCHEZ**

---

3 Submitted to the court by our present counsel *in camera* to abide by its confidentiality terms

Case 1:11-cv-07855-THG Document 22-2   Filed 06/27/11  Page 10 of 49
EXHIBIT A

Next ArticleIrmasworldNext ArticleCoronation Street
Tuesday, 30th March 2010 at 3:06 pm

# Dora the Explorer

by **Samantha Loveday** | Email a friend | Print
Bookmark with Social network



Celebrating its tenth anniversary this year, <mark>Dora the Explorer has notched up some 950 licensees and over $11bn in global retail sales since launch.</mark> We find out more.

Celebrating its tenth anniversary this year, <mark>Dora the Explorer has amassed over $11 billion in global retail sales since 2001.</mark> A pretty impressive fact? Well, I have some more: the series is broadcast in 140 markets, has been translated into 33 languages and 29 Nickelodeon websites worldwide containing Dora microsites or sections.

Still want more? Dora has sold over 20 million DVDs and 50 million books. In 2009, in the UK, 7.9 million viewers tuned into Dora the Explorer, with almost half a million viewers watching 50 or more episodes.

I still have some facts up my sleeve though: globally, Dora ranks among the top three across all Nickelodeon shows. For example, in Australia, year to date Dora is Nick Jr's number one ranking programme among children 0 to four, and during October in France, Dora was number one in its timeslot with a 29 per cent share among four to ten year olds. In Mexico, again in October 2009, Dora was the top show in its timeslot and in Germany, since its launch in September 2005, the character has delivered an average market share of 50.7 per cent. In the US, meanwhile, Dora is the number one pre-school toy licence.

Room for one more? Okay, worldwide there are more than 950 licensees across multiple categories, of which approximately 80 are based out of the UK.

"Dora is a truly global phenomenon," Clare Piggott, VP of consumer products at Nickelodeon UK, tells Licensing.biz. "When the brand first took off in the UK, I was at

EXHIBIT A

Case 1:10-cv-07854-TPG Document 22-52 Filed 06/26/11 Page 11 of 49

Mattel and was aware of how well the toy sales were performing when they went live via the Argos catalogue. I noticed a real groundswell of popularity around the character and I even remember my children being invited to numerous Dora parties, so I did feel that the writing was on the wall for Dora at an early age of the brand's life."

The theme of Dora's anniversary celebrations is 'Explorers Wanted' – a call to action, if you like, inviting pre-schoolers around the world to come and explore with the character.

"It all pays back to empowering children to explore and celebrate with Dora," explains Piggott. "In the UK, the focus of this activity will come from all areas of the Nickelodeon business including the channel itself, online, in-store with our retail and licensing partners, off air events, PR and marketing initiatives. It is of key importance that Dora is represented across all platforms in 2010, as consumers now expect multiplatform experiences from the brands they love. As a broadcaster, we can also look holistically at how our consumer products business is supported by our on-air channel offering."

A range of new style guides have been created around the Explorers Wanted theme to offer a broader range of options to licensees. Nickelodeon has also widened the activities and outfits in the style guides. "[Dora] can still be found in her trademark t-shirt and shorts, but in addition, she can be doing gymnastics, exploring forests, playing in the snow or visiting a farmers' market and has a range of outfits to suit these, and many other occasions. The wide range of style guides also reflects the diverse scenarios and adventures of Dora's on-air content."

In terms of product then, Piggott explains that new items are appearing pretty much constantly in all categories.

"In the toy category for 2010 there is the featured 'We Did It' doll which ties in with the anniversary messaging; she sings and dances, encouraging celebration. Clothing ranges are constantly refreshed and updated for every season; for every phase on the High Street there is something new. This is also the same for publishing. Research has shown that Dora products are regarded as having a greater educational value than all their competitors; this is reflected in new products from tech licensees such as Vtech which has a fantastic new musical-based item and is expanding its range of early learning aids this year. The same applies to Linmark whose range offers pre-schoolers something for on-the-go; they can take music and film with them as they travel and explore."

Various activity is due to take place at retail, too, including unique in-store programmes. Piggott explains: "For example, in one retailer we have developed an activity which enables pre-schoolers to follow a map throughout the store and encourages them to find hidden characters. They can collect stickers, win prizes and

there will be meet and greet opportunities. In another retailer, 'gift with purchase' activity will be linked to a unique giveaway item that is tied in to the anniversary celebrations. We are also designing a first to market promotion with one retailer that involves a huge family holiday competition."

On top of all this retail activity, the shopping centre tour of the UK returns, with a significantly increased number of venues.

Piggott also says that Nickelodeon is developing several alternative iterations of the Dora style guide and looking at how she can appeal to an older audience, although this is not likely to happen in the UK in the immediate future.

Looking forward, and Piggott is confident that Dora has what it takes to remain in the spotlight for another ten years, if not longer.

"Dora is a pre-school property, so within that age range she will always have an appeal," she says. "When a child becomes a fan of the franchise at about two years of age, they can potentially stay loyal until they are about five. That's the natural lifecycle of the relationship. As children develop, Dora goes on a journey with them. New fans are attracted by continuous investment in the property, from new animated series being commissioned to fresh new product ranges that are relevant to the current market being developed with licensees."

Brand Owner

Nickelodeon & Viacom Consumer Products

Genre

Pre-school animated TV series

Key Licensees

Fisher-Price, Simon & Schuster, Vtech, Mega Brands, Paramount, Aykroyds

Website

http://www.nickjr.co.uk/dora

Bookmark with Social network

New User? Register | Sign In | Help                      Trending: Jerry Lewis

YAHOO! TV                                                 [ Search ]

TV HOME          NEWS

[ Search All TV ]                    Trending Now:   Battlestar Galactica   Outcasts   CHAOS

Sign up for Take One: [TAKE ONE!] Your weekly guide to the best in


In this undated publicity image released by
Nickelodeon, the animated character Dora, from
"Dora The Explorer" is shown. (AP
Photo/Nickelodeon)

# 'Dora The Explorer' may change a whole generation

 Associated Press

By SIGAL RATNER-ARIAS, AP Entertainment Writer
Fri Aug 27, 2:49 AM PDT

EXHIBIT A

Share          retweet  **36**

Don't underestimate her just because she's a little girl. "Dora The Explorer" is a multibillion-dollar franchise that may be creating a more enlightened generation, more open to different people and cultures not their own.

Ten years have passed since the Latina Dora became the first bilingual heroine of children's TV and conquered the hearts of kids around the world. Nickelodeon has celebrated the anniversary with a one-hour special that features the voices of Rosie Perez, John Leguizamo and Hector Elizondo, and a documentary with comments from Dora herself, the series' creators, experts from the industry, real-life kids and celebrities such as Salma Hayek and Shakira.

"I think that the fact that kids are identifying with a kid with darker color skin that speaks another language (shows they are more open)," said Chris Gifford, one of the show's creators and executive producers. "Kids want their parents to read them the books and watch Dora with them. ... That's what it's about."

"Dora The Explorer" is seen today in 151 markets and is translated to 30 languages. In English-speaking countries such as the United States, the United Kingdom, Australia, Canada, New Zealand and Ireland, Dora teaches Spanish; in other markets — including the Hispanic U.S. markets — the adventurous little girl teaches English.

According to Nickelodeon, "Dora" has generated over $11 billion in worldwide sales since 2002, having sold 65 million units of Fisher Price Dora the Explorer toys, 50 million books and over 20 million DVDs worldwide. In France, publishing house Albin Michel has sold more than 12 million educational Dora books since its launch — or one Dora book for every child in France, the network points out.

Yet, the original idea for the show had nothing to do with a bilingual girl.

"She didn't start as a Latina or a heroine — she was a forest animal," said co-creator and executive producer Valerie Walsh Valdes. "Nickelodeon actually asked us to consider making her a Latina because a recent study said that there were no positive bilingual characters on children's television."

SPONSORED LINKS

DISH® - Official Site
3 Free Mos HBO, Starz or
Cinemax! Packages Start at
$24.99/mo for 1yr
www.DishNetwork.com

Television Shows
Browse Photos, Watch Clips, Read
Summaries & More - Now on MSN!
movies.msn.com

Television Online
Find info about Television Online.
Online and Local.
www.Yellowise.com

Internet Satellite TV
Watch 3000+ channels On your
PC. No Dish, No Fees, 100%
Legal.
www.StopPayingCableBills.com

So producers turned to such experts as historian Carlos E. Cortes, author of "The Children Are Watching" and "The Making — and Remaking — of a Multiculturalist."

"He was absolutely instrumental in helping us find the best way to put Dora forward in terms of culture," said Gifford. Cortes advised that Dora should always be inclusive, so producers decided not to give her a particular country of origin.

"I am delighted with the way 'Dora' has come out, particularly the impact it seems to be having in young people," said Cortes, professor emeritus of history at the University of California, Riverside. "The Latino kids take pride having Dora as a lead character and non-Latino kids can embrace someone different."

"I think that Dora has a very specific special relationship with kids at home, not necessarily for being bilingual but as a powerful character who invites kids on adventures," says Brown Johnson, president, Animation, Nickelodeon and MTVN Kids and Family Group. "Here, Spanish words open doors."

In "Dora The Explorer," the Latin flavor is present not only in the language and Dora's features but also in characters such as Isa the Iguana and Tico the Squirrel, scenes, themes and family values. The little star invites her young, preschool viewers to come with her on an adventure, where she usually faces a problem that she cannot resolve by herself.

Dora asks her audience to answer questions in an interactive show that includes silences that are long enough for viewers to suggest an answer.

"The kids are feeling good about putting together the puzzle bridge (that will solve the problem). ... Dora needs THEIR help!" says Walsh Valdes.

Each episode relies on the advice of educators and cultural experts, and can take more than a year to produce, in part because not one gets into the air without first being screened in front of the most honest and feared jury: at least 75 children. "Just the heartbreak to see those kids disappointed! We really take it personally. ... These 3 year olds," Gifford said. They really listen to the children, said Walsh Valdes.

Dora's voice has been portrayed the last three years by Caitlin Sanchez. The 14-year-old succeeded the original voice of Dora, Kathleen Herles, when she left to go to college.

"It's really an honor to play an icon," said Sanchez, who enjoys making the voice of the Latina idol in front of her little fans, who immediately recognize it: "It's Dora!" "She's got Dora inside her mouth!"

"Dora is like the most helping person in the world," the young actress said. "I have learned a lot from her, too. ... She's a great role model."

Stars such as Angelina Jolie and Salma Hayek have spoken about the relationship of Dora with their families.

"There's a 'Dora The Explorer' (episode) where Dora's mom has twins — a boy and a girl," Jolie told People magazine in 2008, noting how her older children got ready for the arrival of her own twins. "They watched that a lot."

"I love Dora! She's been such a part of my relationship with my child," said Hayek at the show's 10th anniversary press conference in March. "I love that it's bilingual and that she's a heroine who has Latin roots."

Meanwhile, a Dora balloon made its debut in Macy's 2005 Thanksgiving Day Parade in New York, the first time for a Latino character.

"It's flattering, but it also speaks about how Dora has transcended from just being a preschool show. There's something really amazing in her ability to cross over," said Walsh Valdes.

"Dora" has aired against the backdrop of the immigration debate. When the new Arizona law was announced, a photo of Dora behind bars as a suspected illegal immigrant made the rounds on the Internet.

Such is the influence of Dora, Cortes said, that future fans could affect the political future of America. A 5-year-old viewer in 2000 is now 15.

"It will be another three years until they go to college and be able to vote, and I think we may see a difference. You can't be certain, but our hope is that young people of all backgrounds will be more open," he said. "If Dora can do that, her impact is unimaginable."

———

Online:

http://www.nickjr.com/dora-the-explorer/

Copyright © 2011 The Associated Press. All rights reserved. The information contained in the AP News report may not be published, broadcast, rewritten or redistributed without the prior written authority of The Associated Press.

Back to News

## 857 Comments

Show:  Newest First

Post a Comment                                    Comments 1 - 20 of 857    First  |  Prev  |  Next  |  Last

**Dark The Hedgehog X**  Thu Sep 02, 2010 03:46 pm PDT  |  Report Abuse          0          0

dora is from nickjr

Replies (1)

**Emily**  Sat Aug 28, 2010 04:55 pm PDT  |  Report Abuse          0          0

d o w n t o w r i te .blogspot. com/2010/08/dora-explorer-and-immigration-que.html <--- That's a blog post I wrote about this particular article...and the comments.

Reply

**TonyT**  Sat Aug 28, 2010 01:45 pm PDT  |  Report Abuse          0          0

Well I never thought of her as colored. I'm sure kids don't... I'm missing the point here somehow?

Reply

**That Guy**  Sat Aug 28, 2010 01:04 pm PDT  |  Report Abuse          1          0

I think the hope that Dora can help with race relations might be a bit overplayed in this article (not to say that this isn't a good show for children). After all, Sesame Street had Maria on it for years, providing counting in Spanish and other multicultural benefits. Further, the Cosby Show was the number one program among white people for much of the 1980s. Though I think we are growing into a more accepting culture, I'm not sure that television has nearly the influence that parents and peers have in the long run.

Reply

EXHIBIT A

Case 1:10-cv-07854-TPG   Document 22   Filed 06/27/11   Page 16 of 49

**1:10-cv-07854-TPG** Sanchez v. MTV Networks et al
Thomas P. Griesa, presiding
**Date filed:** 10/14/2010
**Date terminated:** 11/30/2010
**Date of last filing:** 12/06/2010

# History

| Doc. No. | Dates | | Description |
|---|---|---|---|
| | Filed: | 10/14/2010 | Case Designation |
| | Entered: | 10/15/2010 | |
| | Filed: | 10/14/2010 | Case Designated ECF. |
| | Entered: | 10/15/2010 | |
| 1 | Filed: | 10/14/2010 | Notice of Removal |
| | Entered: | 10/15/2010 | |
| 2 | Filed: | 10/14/2010 | Rule 7.1 Corporate Disclosure Statement |
| | Entered: | 10/15/2010 | |
| 3 | Filed: | 10/15/2010 | Amended Notice of Removal |
| | Entered: | 10/19/2010 | |
| 4 | Filed & Entered: | 10/20/2010 | Notice of Appearance |
| 5 | Filed & Entered: | 10/20/2010 | Motion to Remand to State Court |
| | Terminated: | 11/30/2010 | |
| 6 | Filed & Entered: | 10/20/2010 | Memorandum of Law in Support of Motion |
| 7 | Filed & Entered: | 10/20/2010 | Declaration in Support of Motion |
| 8 | Filed & Entered: | 10/26/2010 | Notice (Other) |
| 9 | Filed & Entered: | 10/26/2010 | Motion to Dismiss |
| | Terminated: | 11/30/2010 | |
| 10 | Filed & Entered: | 10/26/2010 | Declaration in Support of Motion |
| 11 | Filed & Entered: | 10/26/2010 | Memorandum of Law in Support of Motion |
| 12 | Filed & Entered: | 11/03/2010 | Rule 26(f) Discovery Plan Report |
| 13 | Filed & Entered: | 11/03/2010 | Memorandum of Law in Opposition to Motion |
| 14 | Filed & Entered: | 11/03/2010 | Declaration in Opposition to Motion |
| 15 | Filed: | 11/08/2010 | Order |
| | Entered: | 11/09/2010 | |
| 16 | Filed: | 11/08/2010 | Stipulation and Order |
| | Entered: | 11/09/2010 | |
| | | | |

| 17 | *Filed & Entered:* | 11/09/2010 | 🌐 Affidavit of Service Other |
|----|---|---|---|
| 18 | *Filed & Entered:* | 11/19/2010 | 🌐 Sealed Document |
| 19 | *Filed & Entered:* | 11/22/2010 | 🌐 Sealed Document |
| 20 | *Filed & Entered:* | 11/30/2010 | 🌐 Stipulation of Voluntary Dismissal |
| 21 | *Filed & Entered:* | 12/01/2010 | 🌐 Stipulation and Order of Dismissal |
| 22 | *Filed:* *Entered:* | 12/06/2010 12/07/2010 | 🌐 Sealed Document |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 05/18/2011 13:16:25 | | |
| **PACER Login:** | xxxxxx | **Client Code:** | |
| **Description:** | History/Documents | **Search Criteria:** | 1:10-cv-07854-TPG |
| **Billable Pages:** | 1 | **Cost:** | 0.08 |

EXHIBIT B

EXHIBIT C

**John G. Balestriere <john.balestriere@balestriere.net>** Thu, Nov 11, 2010 at 12:52 PM
Reply-To: john.balestriere@balestriere.net
To: Caitlin Sanchez ~~xxxxxxxxxxxxxx@xxxxx.xxx~~
Cc: Laura Sayler <laura.sayler@balestriere.net>, Angie Chrysler angie.chrysler@balestriere.net

Hilda and Kevin:
Please see proposed agreements with modification. Please give me your thoughts. (REDACTED-
CONFIDENTIAL ATTORNEY CLIEN-COMMUNICATION)

TAXES - taking out the tax w (REDACTED- CONFIDENTIAL ATTORNEY CLIEN-
COMMUNICATION)

COURT APPROVAL - **based on my reading of the applicable statutes, court
approval is not required, generally, and specifically not required under
the SDNY local rules (LR 83.2 in your initial draft is only an EDNY rule
and not a SDNY rule) or the CPLR (since we're in federal court where the
CPLR does not apply); here, I took the language out, but I'm fine with
language, akin to that in the PSA, which makes the Sanchezes obliged to
cooperate if Nickelodeon wants to take steps to approve the settlement;
I simply don't want to wait for months, or even weeks, for the effective
date, note least when right now we have two briefs due in the case next
week, one on Tuesday, when I'd much rather file our Rule 41 notice by,
hopefully, Monday, rather than worry about another stip extending dates;
again, I took out the court approval requirement, but I'm flexible on
what to put back in here that looks like the language in the PSA** . (EMPHASIS ADDED)


(REDACTED- CONFIDENTIAL ATTORNEY CLIEN-COMMUNICATION)Thanks,
John
John G. Balestriere
BALESTRIERE FARIELLO

---

EXHIBIT C

EXHIBIT D

AS. 8|6|10



**BALESTRIERE FARIELLO**
225 Broadway, Suite 2900
New York, NY 10007

Phone:  +1.212.374.5400
Fax:     +1.212.208.2613
info@balestriere.net
www.balestriere.net

August 6, 2010

**VIA E-MAIL** XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
Hilda Sanchez
XXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXX

> Re:   Engagement of services of Balestriere PLLC d/b/a Balestriere
> Fariello ("the Firm") for your matter against Uptown
> Productions Inc. (the "matter").

Dear Hilda:

This letter confirms the discussions we have had regarding the Firm's representation of you ("you," "your," "yours," "his," "her," "its," or similar pronoun means the person who seeks representation or the person with whom we correspond regarding the status of the matter) in your matter, pending further investigation.  You agree that the Firm has the exclusive right to represent you in connection with this matter. The Firm's services in this matter will end, unless otherwise agreed upon in a writing signed by us, when there is a final agreement, settlement, decision, or a judgment.

### ENGAGEMENT LETTER AND FEE AGREEMENT

LIMITATION OF SCOPE OF SERVICES
Not included within the scope of our representation are appeals from any judgments or orders of the court, addressing counter-claims or claims of any kind against you in this or any other matter, or enforcement of judgments.  Such other services are subject to separate discussions and negotiation between our Firm and you.  Also not included in the scope of this engagement are services you may request in connection with any other matter, action, or proceeding.

ENTIRE AGREEMENT AND SEVERABILITY
This letter contains the entire understanding of you and the Firm with regard to our provision of services to you.  If any provision of this agreement ("Agreement") is held in whole or in part to be unenforceable for any reason, the remainder of that provision and of the entire Agreement will be severable and remain in effect.

FEES, EXPENSES, BILLING, AND PAYMENT
Fees and Expenses: Distinction.  The different terms "fees" and "expenses" have the ordinary meaning as those terms are used regarding legal services.



HS. 8/6/10

- Fees are payments to a lawyer for services and value provided by the lawyer.
- Expenses are moneys actually spent out of pocket on goods or services separate and apart from the actual services or value provided by the lawyer.

Money in Trust. You will be required to pay the Firm money to hold in trust against which expenses would be charged, and as a security deposit. The initial payment we require is **$10,000.00**. Any money held in trust and not used for expenses or fees will, of course, be promptly returned to you after our services have ended. Unless we specifically agree otherwise, we shall not advance any expenses but, instead, will require you to pay directly for any expenses which exceed the amount of money we hold in trust. This includes, but is not limited to, you (and not the Firm) engaging the services of experts and/or professional services, if either are necessary. We would, of course, make all arrangements for such service providers (outside of actual payment for them).

Hourly Rates. Unless and until we enter into a new Agreement, you wish to pay us by hour. For your information, the firm charges for all time spent on a matter by any attorney (including partners, of counsel, and associates), employee, or affiliate including, without limitation, the time spent in any telephone calls or correspondence, including letters or electronic mail, to you, other parties, other attorneys, employees, or affiliates of the firm; the time spent conferring with you, other attorneys, others at the firm, or anyone else on a matter; the time spent reviewing, preparing, or organizing documents of any kind in any manner; the time engaged in legal or any other kind of research; the time spent in any kind of counseling services; the time spent conferring with outside experts, witnesses, or other third parties; the time spent in meetings or any kinds of communication with any individuals, including you; the time spent engaging in any analysis; the time spent preparing for or actually conducting any negotiations or discussions with adverse or other parties; the time spent in any depositions, hearings, arbitrations, court appearances, or trial, or preparing for such depositions, hearings, arbitrations, court appearances, or trial; any travel time necessary to attend negotiations, depositions, hearings, arbitrations, court appearances, trials, or anything else; and the time spent in any form of litigation, arbitration, legal counseling, or investigation. The firm records time in units of one-tenth of an hour.

| | |
|---|---|
| Senior attorney | $620 - $730/hour |
| Of Counsel and mid-level attorneys | $440 - $570/hour |
| Other attorneys and law clerks, and apprentices | $245 - $560/hour |
| Analysts | $225/hour |

We contemporaneously record time devoted to the matter. All time spent in any way on a matter by any employee or affiliate of the Firm is recorded and, thus, would be a basis for a fee if a non-cash settlement or a recovery under $100,000 were achieved. These hourly rates are subject to reasonable annual increases without notice to you, though we shall provide notice regarding hourly rate charges upon request.

2

**BALESTRIERE
FARIELLO**

*HS 9/6/10*

We agree that John Balestriere's first 20 hours of time shall be discounted by 40% and the first 10 hours of any other staff time shall be discounted by 25%.

<u>Compensation for Other Matters</u>. The Firm's Fee Agreement with you in this letter encompasses only our representation in the matter. As noted above, **if we perform legal services for you on any other matter, you agree to pay the Firm based on our standard hourly rates** and to reimburse us for our costs as set forth in our statements to you, which shall be billed monthly and payable on receipt.

<u>Additional Charges for Expenses</u>. You are completely and solely responsible for <u>any</u> out-of-pocket costs of <u>any</u> kind and <u>any</u> expenses actually incurred on your matter, however small. These include, by way of non-exhaustive example, expenses for travel (including reasonable client-related travel, lodging, and other expenses), photocopying, facsimiles, off-site discovery or other litigation or investigations support services, courier and messenger services, private investigators, shipping and postage, online legal research (billed proportionally to the amount of research done on your matter), expert witnesses and/or professional vendor services of any kind, transcription services, meals for staff who spend time during the meal working on the case, overtime clerical costs, late night car or cab service (when staff works on your matter past 9:00pm, and will be billed proportionally to the amount of time spent on your case in addition to other matters), electronic funds transfer or bank transaction charges, and other items and services related to your matter. These charges will be distinguished in the invoice you receive.

<u>Late charges</u>. If you fail to meet any of your promises under this Agreement and instead make a payment or partial payment of any kind (fee or expense) that is late, **you shall be assessed a monthly service charge equal to 1% of the monthly flat fee or the portion of the payment you make which is late**. The service charge shall be assessed every month a payment is late, and, if not paid immediately, shall be compounded. We must assess this charge given the increased administrative costs associated with attempting to obtain payment from you. A payment shall be considered late under this Agreement if received by the Firm ten (10) days or more after any payment is due (regardless of when such payment was sent by you or any other party). This monthly service charge shall be assessed every time that a payment or partial payment is late.

Any monthly service charges may be paid by you as you incur the service charges, or may be immediately deducted from any moneys held in trust, or may remain an outstanding balance that you owe us. In no event will the service charge be greater than that permitted by any applicable law.

<u>PROMISE NOT TO POST DATA ONLINE</u>
You acknowledge that as a law firm, it is important to us that we maintain the reputation we have cultivated for integrity, seeking the public good, and providing

3



#5. 8/6/10

quality work.  You further acknowledge that information posted in any fashion on the Internet can often be manipulated, even if the author of such posting does not intend the manipulated result.

As such, you acknowledge that you shall not publicize the fact of the Firm's representation of you, what the Firm is doing in your matter, or any other information of any kind whatsoever about or regarding the Firm or any staff or affiliates of the Firm ("posted data") in, on, or "hyperlinked" to any weblog, blog, bulletin board, complaint board, social media site (e.g., Facebook, MySpace, Twitter or any other similar site), or any other "on-line" medium, website, homepage, or any other medium of any kind, whether personal, professional, educational, informational, or otherwise which is supported in any fashion by the Internet or which has a so-called website address or URL (i.e., a uniform resource locator such as, for example, http://www.websiteaddress.com) which is capable of being viewed by any party other than you.  Specifically excepted from this is information placed on media often called Intranets which are only viewable by you.

Moreover, given the difficulty in assessing the damages to the Firm from any manipulation of posted data, you acknowledge that the Firm shall be due liquidated damages of at least $50,000 if you violate this section.

POTENTIAL TERMINATION OF RELATIONSHIP

Initial Termination of Services.  If after our initial investigation and before we file any complaint or notice of claim and before we contact any adversarial party or agent of adversarial party we decide not to continue to represent you in this matter, we shall notify you of that decision and our services will be terminated.  After that point there will no longer be an attorney-client relationship between us, and we will not represent you further in this matter.

Moreover, at any time after the execution of this Agreement or any future engagement Agreement or amendment, you agree that we have the right to stop representing you in this matter, consistent with our ethical obligations, and you have the right to terminate our services without cause.  If we decide to stop representing you, we shall notify you of that decision, and all of our services in this matter will be terminated.

Withdrawal.  The Firm may withdraw from engagement at any time permitted by law.  The circumstances under which it may be permissible to withdraw include, but are not limited to, the following:  (a) upon your consent, or (b) if we determine that you have made a material misrepresentation to the Firm or omitted to disclose a material fact to the Firm, or (c) if, in the Firm's opinion, your conduct renders it unreasonably difficult for the Firm to carry out its retention effectively.  In the unlikely event that circumstances make it necessary to do so, we may withdraw with good cause from this engagement for nonpayment of fees or for any other reason authorized or required by the applicable rules

**BALESTRIERE FARIELLO**

HS 8/6/10

of professional conduct. Notwithstanding the Firm's withdrawal, you will be obligated to pay the Firm its fees set forth in this Agreement, and to reimburse the Firm for all costs (including expenses) advanced before the withdrawal.

We hope that this relationship continues for the life of this matter, and we would only terminate our services consistent with our ethical obligations to you.

Client's Termination of Services. You are, of course, entitled to terminate this engagement for any reason, subject to the Firm's right to be paid for services already rendered and expenses already incurred on your matter or any other service the Firm has provided for you. If you decide to terminate the Firm without good cause shown, and made explicit to us in writing, we shall still be due our attorneys' fees, determined by what the Firm would have billed by the hour for the time we devoted to the matter, using the Firm's standard hourly rate.

We obviously hope that neither side will seek to terminate the relationship. While the fee arrangement described in this letter otherwise controls, if either of us does decide to terminate the relationship, we agree to discuss the best way to resolve any fee arrangement.

ARBITRATION

In the event that a dispute arises between us relating to our fees, you may have the right to arbitration of the dispute pursuant to Part 137 of the Rules of the Chief Administrator of the Courts, a copy of which is attached to this letter.

COOPERATION AND TRUST

Having reviewed the Statement of Client Rights and the Statement of Client Responsibilities sent to you with this letter, you agree to cooperate and fully participate in the conduct of any matter in which we provide services to you, including providing us with information we need in order to adequately represent you and provide the services you wish.

Such cooperation also includes, but is not limited to:

- reasonably being available for meetings in our office and for phone calls;
- promptly responding to any correspondence we send to you, including e-mails;
- **timely paying invoices, and raising any concerns you have with any invoices with us immediately**;
- raising issues of concern with us, of any kind, promptly and without delay;
- devoting your own time necessary to achieve as successful a resolution as possible in your matter;

5

**BALESTRIERE
FARIELLO**

HS. 8/6/10

- being available to review drafts of documents when necessary which you acknowledge are sent to you in draft form for your approval.
- promptly providing truthful and complete responses to any requests for information, and not failing to disclose or omit information of any kind whatsoever which is material to the matter or to our attorney-client relationship; **you promise to provide this information even if you believe you have previously disclosed the requested information** (such repeated requests are commonplace and necessary, particularly at the beginning of a matter, so we're sure that we fully understand the facts and can be the best advocates we can be for your position);
- trusting that we will always endeavor to have our Firm take whatever steps we believe necessary services, and spend whatever time is warranted, in order to provide you with superior legal representation and counseling (we are organized to be efficient, and shall always strive to be, but will not be so at the expense of quality work product or our ethical obligations);
- being prepared to push this case to trial or arbitration if necessary (you should NOT engage us unless you are prepared to go the distance in this matter and push the case to arbitration or trial);
- committing to engage only in legal and ethical conduct, and conduct which comports with any applicable laws, rules, and regulations.

MAJOR DECISION MAKING

We shall make all tactical, strategic, and litigation decisions in the matter we are ethically permitted to, **including any public relations decisions (including dealing with any media and issuance of any public statements of any kind, including press releases).** Obviously, however, we shall discuss all major decisions in the case with you. You acknowledge that we have that right to publicize or otherwise distribute public information regarding the matter.

INDEMNIFICATION

You agree to indemnify and hold harmless the Firm from any and all actions, suits, proceedings, and investigations brought by third parties for damages, obligations, penalties, judgments, awards, liabilities, costs, expenses and/or disbursements directly or indirectly caused by, relating to, based upon, arising out of, and/or in connection with your engagement of services by the Firm. This provision shall in no way limit your right to bring a legal malpractice claim against the Firm to the extent permitted by law.

NO GUARANTEE OF ANY RESULTS

Best Efforts; Good Faith. Subject to the terms and conditions herein provided, we agree to use our best efforts to take, or cause to be taken, all actions, and to do, or cause to be done as promptly as practicable, all things necessary, proper, and advisable to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement. We agree to act in good faith toward each other in connection with

6



HS 8/6/10

this Agreement and to take all reasonable actions to disclose and keep each other informed of any facts or circumstances that could affect this arrangement.

Estimates.   All litigation is by definition inherently risky and unpredictable. Consequently, although we may offer an opinion about the possible or probable course or results of our engagement, including fees and costs needed to complete the matter, we cannot and do not guarantee or represent that we can obtain any particular result, or that the amount of fees or costs shall be a certain amount or less.  Any projections we make regarding costs shall be made in good faith but are not guaranteed regarding what the actual cost will be.  The cost of litigation may change dramatically based on factors we do not control, including, for example, actions taken by our adversary, rulings by the court, or other developments in the litigation.  The actual fees and costs for which you will be liable will be based on this Agreement.  Past results do not guarantee future outcomes.

Lien.   The Firm will have a lien for its fees and costs (including expenses) advanced on all claims and causes of action subject to its representation of you under this Agreement and on all proceeds of any recovery obtained (whether by settlement, arbitration award, or court judgment).

INDEPENDENT COUNSEL
You acknowledge that you had sufficient time to review this letter and consult with other attorneys or advisors concerning this letter if you so desire, and that you have freely determined to execute this Agreement without duress.

AUTHORITY
By signing this Agreement, you acknowledge and confirm that you are bound to the terms of this Agreement and you are, in fact, bound to such terms.  You also acknowledge that you personally undertake and assume the full performance hereof, including payments of amounts hereunder.

PERSONAL GUARANTEE.
Additionally, your signature below indicates that you are bound personally by this Agreement as well.  Any obligations which you have under this Agreement, including obligations to make any payments, are yours personally as well.  You agree that any limited liability protection which you may be afforded in other contexts categorically does not limit your liabilities or obligations personally under this Agreement.

COMMUNICATION
It is important to us that our clients be aware of the progress of their matters, and that they have the full opportunity to ask us any questions that may arise.  Accordingly, we hope you will feel free to contact us—either in our office, on our mobile phones, or via e-mails—with any questions, whether relating to the case, your invoices, the fees, or anything else regarding our relationship.



HS. 8|6|10

## MISCELLANEOUS

This Agreement may not be amended, waived, or modified without the mutual written consent of all of the parties hereto. This letter Agreement shall be governed and construed in accordance with the laws of the State of New York without regard to any applicable principles of conflicts of law. If any dispute or claim between the parties shall arise, the parties shall submit to and have such dispute resolved by the State courts sitting in New York, New York, unless any applicable rule requires consideration of the option of arbitration. It is understood and agreed that this Agreement may be executed in identical counterparts and may be transmitted by facsimile or e-mail, each of which shall be deemed an original for all purposes.

If you have any questions about anything at all, please do not hesitate to contact us.

Sincerely,

_____          _____
John Balestriere                                          Date
Balestriere Fariello

The above is understood and agreed to:

_____          8/6/10
Hilda Sanchez                                            Date

8

EXHIBIT D

EXHIBIT E



**BALESTRIERE FARIELLO**
225 Broadway, Suite 2900
New York, NY 10007
Phone: +1.212.374.5400
Fax:    +1.212.208.2613
info@balestriere.net
www.balestriere.net

August 26, 2010

**VIA E-MAIL** XXXXXXXXXXXXXXXXXXXX
Hilda Sanchez
XXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXX
Fairview, NJ 07022

> Re: Engagement of services of Balestriere PLLC d/b/a Balestriere
> Fariello ("the Firm") for your matter against Viacom,
> Nickelodeon, CESD Talent Agency, Inc., and Uptown
> Productions Inc. (the "matter").

Dear Hilda:

This letter confirms the discussions we have had regarding the Firm's representation of you ("you," "your," "yours," "his," "her," "its," or similar pronoun means the person who seeks representation or the person with whom we correspond regarding the status of the matter) in your matter, <u>pending further investigation</u>. You agree that the Firm has the <u>exclusive</u> right to represent you in connection with this matter. The Firm's services in this matter will end, unless otherwise agreed upon in a writing signed by us, when there is a final agreement, settlement, decision, or a judgment.

**ENGAGEMENT LETTER AND FEE AGREEMENT**

<u>LIMITATION OF SCOPE OF SERVICES</u>

Not included within the scope of our representation are appeals from any judgments or orders of the court, addressing counter-claims or claims of any kind against you in this or any other matter, or enforcement of judgments. Such other services are subject to separate discussions and negotiation between our Firm and you. Also not included in the scope of this engagement are services you may request in connection with any other matter, action, or proceeding.

<u>ENTIRE AGREEMENT AND SEVERABILITY</u>

This letter contains the entire understanding of you and the Firm with regard to our provision of services to you. If any provision of this agreement ("Agreement") is held in whole or in part to be unenforceable for any reason, the remainder of that provision and of the entire Agreement will be severable and remain in effect.

This Agreement replaces the previous engagement letter ("Initial Agreement") you signed with the Firm on August 6, 2010. The Initial Agreement is no longer controlling once this Agreement is signed by you.

EXHIBIT E



FEES, EXPENSES, BILLING, AND PAYMENT

**Success or Share of the Recovery Fee**.  The representation of you by this or any other lawyer with which we choose to coordinate our efforts in this matter is on the basis described below.   While you may pay us on an hourly rate basis, we both agree that you wish to proceed on a largely contingency or success fee basis.

The Firm will receive a fee (the "Success Fee") based on the recovered amount (the "Recovery").

The Recovery is defined as a cash recovery or anything of value, or any other service or thing of value of any kind, from any source,  including, without limitation, (a) any purchase or purchase rights of any assets, licensing agreements, or any business transactions or goodwill which have any value of any kind; (b) restitution from any source, including a government source, if our Firm has, prior to the payment of restitution, had any contact of any kind with the source; (c) reduction of any amount of any debt or any financing obligations of any kind; or (d) attorney's fees and costs, from any party, whether from actual litigation, negotiation, arbitration, advocacy, consultation, or otherwise, including, but not limited to, by way of court order or any agreement.

The Success Fee shall be determined on the following schedule:

- 35% of the entire Recovery (however recovered) if the case is settled before the beginning of any discovery of any kind,
- 37.5% of the entire Recovery (however recovered) after any discovery of any kind has begun, and

Fees and Expenses: Distinction.  The different terms "fees" and "expenses" have the ordinary meaning as those terms are used regarding legal services.
- Fees are payments to a lawyer for services and value provided by the lawyer.
- Expenses are moneys actually spent out of pocket on goods or services separate and apart from the actual services or value provided by the lawyer.

If, in any action, you are ordered or agree to pay any money, or provide any other service or thing of value of any kind, from any source, as a party, this shall not reduce the Success Fee.  As an example, if we obtain a recovery for you of $1,000.00, but you also, as part of the matter, either agree to or are ordered as part of a judgment or any other order, pay $250.00 to another party, our Success Fee shall still be based on the recovery of $1,000.00, which we obtain for you, and not reduced by the amount ($250.00) you are ordered to pay.

Payment.  The Firm shall receive the actual payment for any recovery or portion of the recovery into the Firm's trust account.  The Success Fee shall then be paid to the Firm.

2

**BALESTRIERE FARIELLO**

Then, expenses advanced by the Firm, if any, will be deducted from the remainder of the recovery and paid to the Firm. Finally, the amount of recovery that is left over will remain in the Firm's trust account until the undersigned has agreed to the distribution of the balance of the recovery. If multiple clients are engaged, and unless otherwise directed, we shall distribute the remaining recovery in equal portions, by check, to each client.

Monthly Fee. As the case proceeds, you agree to pay a fee for September 2010 of $4,000.00. If we achieve a recovery, the fees you have paid to the Firm shall be deducted from the payment due the Firm at the end of the matter as described in the Success or Share of the Recovery Fee paragraphs above. However, under no circumstances shall the Firm have to pay back to you any fees already paid by you.

Money in Trust. We recently received a check in the amount of $5,000.00 (#165) for which $4,000.00 will be applied towards your September 2010 payment, with the remainder being held in trust against which expenses would be charged, and as a security deposit. Your previous payment of $10,000 covers fees and expenses for August 2010. Any money held in trust and not used for fees or expenses will, of course, be promptly returned to you after our services have ended. Unless we specifically agree otherwise, we shall not advance any expenses but, instead, will require you to pay directly for any expenses which exceed the amount of money we hold in trust. This includes, but is not limited to, you (and not the Firm) engaging the services of experts and/or professional services, if either are necessary. We would, of course, make all arrangements for such service providers (outside of actual payment for them).

Hourly Rates. For your information, the Firm charges for all time spent on a matter by any attorney (including partners, of counsel, and associates), employee, or affiliate including, without limitation, the time spent in any telephone calls or correspondence, including letters or electronic mail, to you, other parties, other attorneys, employees, or affiliates of the firm; the time spent conferring with you, other attorneys, others at the firm, or anyone else on a matter; the time spent reviewing, preparing, or organizing documents of any kind in any manner; the time engaged in legal or any other kind of research; the time spent in any kind of counseling services; the time spent conferring with outside experts, witnesses, or other third parties; the time spent in meetings or any kinds of communication with any individuals, including you; the time spent engaging in any analysis; the time spent preparing for or actually conducting any negotiations or discussions with adverse or other parties; the time spent in any depositions, hearings, arbitrations, court appearances, or trial, or preparing for such depositions, hearings, arbitrations, court appearances, or trial; any travel time necessary to attend negotiations, depositions, hearings, arbitrations, court appearances, trials, or anything else; and the time spent in any form of litigation, arbitration, legal counseling, or investigation. The firm records time in units of one-tenth of an hour. Please note that as of September 1, 2010, the Firm's hourly rates will be increasing.

3

**BALESTRIERE FARIELLO**

| | |
|---|---|
| Senior attorney | $620 - $755/hour |
| Of Counsel and mid-level attorneys | $440 - $570/hour |
| Other attorneys and law clerks, and apprentices | $205 - $560/hour |
| Analysts | $210 - $240/hour |

We contemporaneously record time devoted to the matter. All time spent in any way on a matter by any employee or affiliate of the Firm is recorded and, thus, would be a basis for a fee if a non-cash settlement or a recovery under $100,000 were achieved. These hourly rates are subject to reasonable annual increases without notice to you, though we shall provide notice regarding hourly rate charges upon request.

Award of Costs and Fees. In certain circumstances, a court may order the payment of costs or attorneys' fees by one party to the other. If any such fees or costs are paid to us, they will be credited against the amounts you would owe us, pursuant to this Agreement, but you will remain obligated for the balance of the fees and costs owed us pursuant to this Agreement. If a court should award fees or costs against you and in favor of an opposing party, you will be solely responsible for payment of that amount separately from any amounts due to us, and without regard to the outcome of the litigation.

Settlement. The Firm will notify you promptly of the terms of any settlement offer received by the Firm. If, however, you instruct the Firm to settle contrary to the advice of the Firm, the Firm will be entitled, at its sole option, to the greater of (i) a fee calculated in accordance with the percentages set forth in the Success or Share of the Recovery Fee paragraph above, applied to the amount of **$250,000**, or (ii) its attorneys' fees, (including its fees for the services of any employees or affiliates of the Firm calculated at the Firm's non-discounted hourly rates, as well as reimbursement for all costs (including expenses) advanced before the settlement). The Firm will not settle your claim without your approval. Subject to the foregoing, you shall have the absolute right to accept or reject any settlement.

Dismissal of Action. If you instruct the Firm to dismiss your action, contrary to the advice of the Firm, the Firm will be entitled, at its sole option, to the greater of (i) a fee calculated in accordance with the percentages set forth in the Success or Share of the Recovery Fee paragraph above, applied to the amount of **$250,000**, or (ii) its attorneys' fees, (including its fees for the services of any employees or affiliates of the Firm calculated at the Firm's non-discounted hourly rates, as well as reimbursement for all costs (including expenses) advanced before the settlement).

Compensation for Other Matters. The Firm's Fee Agreement with you in this letter encompasses only our representation in the matter. As noted above, **if we perform legal services for you on any other matter, you agree to pay the Firm based on our standard**

4



**hourly rates** and to reimburse us for our costs as set forth in our statements to you, which shall be billed monthly and payable on receipt.

Additional Charges for Expenses. You are completely and solely responsible for any out-of-pocket costs of any kind and any expenses actually incurred on your matter, however small. These include, by way of non-exhaustive example, expenses for travel (including reasonable client-related travel, lodging, and other expenses), photocopying, facsimiles, off-site discovery or other litigation or investigations support services, courier and messenger services, private investigators, shipping and postage, online legal research (billed proportionally to the amount of research done on your matter), expert witnesses and/or professional vendor services of any kind, transcription services, ==meals for staff who spend time during the meal working on the case, overtime clerical costs, late night car or cab service (when staff works on your matter past 9:00pm, and will be billed proportionally to the amount of time spent on your case in addition to other matters)==, electronic funds transfer or bank transaction charges, and other items and services related to your matter. These charges will be distinguished in the invoice you receive.

Late charges. If you fail to meet any of your promises under this Agreement and instead make a payment or partial payment of any kind (fee or expense) that is late, **you shall be assessed a monthly service charge equal to 1% of the monthly flat fee or the portion of the payment you make which is late**. The service charge shall be assessed every month a payment is late, and, if not paid immediately, shall be compounded. We must assess this charge given the increased administrative costs associated with attempting to obtain payment from you. ==A payment shall be considered late under this Agreement if received by the Firm ten (10) days or more after any payment is due (regardless of when such payment was sent by you or any other party).== This monthly service charge shall be assessed every time that a payment or partial payment is late.

Any monthly service charges may be paid by you as you incur the service charges, or may be immediately deducted from any moneys held in trust, or may remain an outstanding balance that you owe us. In no event will the service charge be greater than that permitted by any applicable law.

==PROMISE NOT TO POST DATA ONLINE==
You acknowledge that as a law firm, it is important to us that we maintain the reputation we have cultivated for integrity, seeking the public good, and providing quality work. You further acknowledge that information posted in any fashion on the Internet can often be manipulated, even if the author of such posting does not intend the manipulated result.

==As such, you acknowledge that you shall not publicize the fact of the Firm's representation of you,== what the Firm is doing in your matter, or any other information of any kind whatsoever about or regarding the Firm or any staff or affiliates of the Firm

5

("posted data") in, on, or "hyperlinked" to any weblog, blog, bulletin board, complaint board, social media site (e.g., Facebook, MySpace, Twitter or any other similar site), or any other "on-line" medium, website, homepage, or any other medium of any kind, whether personal, professional, educational, informational, or otherwise which is supported in any fashion by the Internet or which has a so-called website address or URL (i.e., a uniform resource locator such as, for example, http://www.websiteaddress.com) which is capable of being viewed by any party other than you.  Specifically excepted from this is information placed on media often called Intranets which are only viewable by you.

Moreover, given the difficulty in assessing the damages to the Firm from any manipulation of posted data, you acknowledge that the Firm shall be due liquidated damages of at least $50,000 if you violate this section.

POTENTIAL TERMINATION OF RELATIONSHIP

Initial Termination of Services.  If after our initial investigation and before we file any complaint or notice of claim and before we contact any adversarial party or agent of adversarial party we decide not to continue to represent you in this matter, we shall notify you of that decision and our services will be terminated.  After that point there will no longer be an attorney-client relationship between us, and we will not represent you further in this matter.

Moreover, at any time after the execution of this Agreement or any future engagement Agreement or amendment, you agree that we have the right to stop representing you in this matter, consistent with our ethical obligations, and you have the right to terminate our services without cause.  If we decide to stop representing you, we shall notify you of that decision, and all of our services in this matter will be terminated.

Withdrawal.  The Firm may withdraw from engagement at any time permitted by law.  The circumstances under which it may be permissible to withdraw include, but are not limited to, the following:  (a) upon your consent, or (b) if we determine that you have made a material misrepresentation to the Firm or omitted to disclose a material fact to the Firm, or (c) if, in the Firm's opinion, your conduct renders it unreasonably difficult for the Firm to carry out its retention effectively.  In the unlikely event that circumstances make it necessary to do so, we may withdraw with good cause from this engagement for nonpayment of fees or for any other reason authorized or required by the applicable rules of professional conduct.  Notwithstanding the Firm's withdrawal, you will be obligated to pay the Firm its fees set forth in this Agreement, and to reimburse the Firm for all costs (including expenses) advanced before the withdrawal.

We hope that this relationship continues for the life of this matter, and we would only terminate our services consistent with our ethical obligations to you.

6



<u>Client's Termination of Services</u>.  You are, of course, entitled to terminate this engagement for any reason, subject to the Firm's right to be paid for services already rendered and expenses already incurred on your matter or any other service the Firm has provided for you.  If you decide to terminate the Firm without good cause shown, and made explicit to us in writing, we shall still be due our attorneys' fees, determined by what the Firm would have billed by the hour for the time we devoted to the matter, using the Firm's standard hourly rate.

We obviously hope that neither side will seek to terminate the relationship.  While the fee arrangement described in this letter otherwise controls, if either of us does decide to terminate the relationship, we agree to discuss the best way to resolve any fee arrangement.

<u>ARBITRATION</u>

In the event that a dispute arises between us relating to our fees, you may have the right to arbitration of the dispute pursuant to Part 137 of the Rules of the Chief Administrator of the Courts, a copy of which is attached to this letter.

<u>COOPERATION AND TRUST</u>

Having reviewed the Statement of Client Rights and the Statement of Client Responsibilities sent to you with this letter, <u>you agree to cooperate and fully participate in the conduct of any matter in which we provide services to you, including providing us with information we need in order to adequately represent you and provide the services you wish</u>.

Such cooperation also includes, but is not limited to:

- reasonably being available for meetings in our office and for phone calls;
- promptly responding to any correspondence we send to you, including e-mails;
- **timely paying invoices, and raising any concerns you have with any invoices with us immediately**;
- raising issues of concern with us, of any kind, promptly and without delay;
- devoting your own time necessary to achieve as successful a resolution as possible in your matter;
- being available to review drafts of documents when necessary which you acknowledge are sent to you in draft form for your approval.
- promptly providing truthful and complete responses to any requests for information, and not failing to disclose or omit information of any kind whatsoever which is material to the matter or to our attorney-client relationship; **you promise to provide this information even if you believe you have previously disclosed the requested information** (such repeated requests are commonplace and necessary, particularly at the beginning of a

7



matter, so we're sure that we fully understand the facts and can be the best advocates we can be for your position);

- trusting that we will always endeavor to have our Firm take whatever steps we believe necessary services, and spend whatever time is warranted, in order to provide you with superior legal representation and counseling (we are organized to be efficient, and shall always strive to be, but will not be so at the expense of quality work product or our ethical obligations);
- being prepared to push this case to trial or arbitration if necessary (you should NOT engage us unless you are prepared to go the distance in this matter and push the case to arbitration or trial);
- committing to engage only in legal and ethical conduct, and conduct which comports with any applicable laws, rules, and regulations.

MAJOR DECISION MAKING

We shall make all tactical, strategic, and litigation decisions in the matter we are ethically permitted to, **including any public relations decisions (including dealing with any media and issuance of any public statements of any kind, including press releases).** Obviously, however, we shall discuss all major decisions in the case with you. You acknowledge that we have that right to publicize or otherwise distribute public information regarding the matter.

INDEMNIFICATION

You agree to indemnify and hold harmless the Firm from any and all actions, suits, proceedings, and investigations brought by third parties for damages, obligations, penalties, judgments, awards, liabilities, costs, expenses and/or disbursements directly or indirectly caused by, relating to, based upon, arising out of, and/or in connection with your engagement of services by the Firm. This provision shall in no way limit your right to bring a legal malpractice claim against the Firm to the extent permitted by law.

NO GUARANTEE OF ANY RESULTS

Best Efforts; Good Faith. Subject to the terms and conditions herein provided, we agree to use our best efforts to take, or cause to be taken, all actions, and to do, or cause to be done as promptly as practicable, all things necessary, proper, and advisable to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement. We agree to act in good faith toward each other in connection with this Agreement and to take all reasonable actions to disclose and keep each other informed of any facts or circumstances that could affect this arrangement.

Estimates. All litigation is by definition inherently risky and unpredictable. Consequently, although we may offer an opinion about the possible or probable course or results of our engagement, including fees and costs needed to complete the matter, we cannot and do not guarantee or represent that we can obtain any particular result, or that the amount of fees or costs shall be a certain amount or less. Any projections we make

8



regarding costs shall be made in good faith but are not guaranteed regarding what the actual cost will be. The cost of litigation may change dramatically based on factors we do not control, including, for example, actions taken by our adversary, rulings by the court, or other developments in the litigation. The actual fees and costs for which you will be liable will be based on this Agreement. Past results do not guarantee future outcomes.

<u>Lien</u>. The Firm will have a lien for its fees and costs (including expenses) advanced on all claims and causes of action subject to its representation of you under this Agreement and on all proceeds of any recovery obtained (whether by settlement, arbitration award, or court judgment).

<u>INDEPENDENT COUNSEL</u>
You acknowledge that you had sufficient time to review this letter and consult with other attorneys or advisors concerning this letter if you so desire, and that you have freely determined to execute this Agreement without duress.

<u>AUTHORITY</u>
By signing this Agreement, you acknowledge and confirm that you are bound to the terms of this Agreement and you are, in fact, bound to such terms. You also acknowledge that you personally undertake and assume the full performance hereof, including payments of amounts hereunder.

<u>PERSONAL GUARANTEE</u>.
Additionally, your signature below indicates that you are bound personally by this Agreement as well. Any obligations which you have under this Agreement, including obligations to make any payments, are yours personally as well. You agree that any limited liability protection which you may be afforded in other contexts categorically does not limit your liabilities or obligations personally under this Agreement.

<u>COMMUNICATION</u>
It is important to us that our clients be aware of the progress of their matters, and that they have the full opportunity to ask us any questions that may arise. Accordingly, we hope you will feel free to contact us—either in our office, on our mobile phones, or via e-mails—with any questions, whether relating to the case, your invoices, the fees, or anything else regarding our relationship.

<u>MISCELLANEOUS</u>
This Agreement may not be amended, waived, or modified without the mutual written consent of all of the parties hereto. This letter Agreement shall be governed and construed in accordance with the laws of the State of New York without regard to any applicable principles of conflicts of law. If any dispute or claim between the parties shall arise, the parties shall submit to and have such dispute resolved by the State courts sitting in New York, New York, unless any applicable rule requires consideration of the option

9

**BALESTRIERE FARIELLO**

of arbitration. It is understood and agreed that this Agreement may be executed in identical counterparts and may be transmitted by facsimile or e-mail, each of which shall be deemed an original for all purposes.

If you have any questions about anything at all, please do not hesitate to contact us.

Sincerely,

_____           _____
John Balestriere                                              Date
Balestriere Fariello

The above is understood and agreed to:

_____           _____
Hilda Sanchez                                              Date

10                                    EXHIBIT E

**Home** >> **Icky Icky Poo** , **TV News** , **Legal Matters** >> **Dora Needs A New Lawyer!**

# Dora Needs A New Lawyer!

Filed under: **Icky Icky Poo** > **TV News** > **Legal Matters**



Rapido!

The lawyer for *Dora the Explorer*'s voice actress, **Caitlin Sanchez** seems like a total scumbag!

**John Balestriere** says that his client, Caitlin, was taken <u>advantage</u> of by the network when they refused to pay her a cut of lucrative merchandising deals or residuals after she was fired when her voice changed.

Instead of trying to make a keep things civil, he's resorted to using shady tactics to get Nickelodeon to cave, such as threatening to humiliate the network by exposing some unflattering secrets and allowing Caitlin to go on talk shows and dish out the dirt.

"We're in the right here and are simply focusing now on pushing the case forward and are ready to fight however long we need to," Caitlin's lawyer says.

Nickelodeon fired back with the following:

> "The threats made to us by the lawyer are not only totally inappropriate, but it truly saddens us that he would try to use a 14-year-old girl to gain what he believes would be some sort of advantage. Our company prides itself on its honesty and integrity and has nothing to hide. Intimidation tactics will not help in the resolution of this dispute."

What a nasty way to get more money and to use a 14-year-old girl for the ol' bait and switch is even more disgusting! Get a new lawyer, Caitlin!

[*Image via <u>WENN</u>.*]

<small>Tags: <u>caitlin sanchez</u>, <u>dora the explorer</u>, <u>john balestriere lawyer</u>, <u>nickelodeon</u>, <u>shady</u></small>

- <u>T.I. Speaks Out About His 11-Month Jail Sentence</u>
- <u>Will Arnett Supports Twitter Petition To Save *Running Wilde*</u>
- <u>*Sex & The City*'s Cynthia Nixon Returns To TV!</u>
- <u>Oksana Hires 39 Lawyers To Fight Mel</u>
- <u>*Leave It To Beaver*'s Mom Barbara Billingsley Passes Away</u>

Posted: Oct 18, 2010 at 10:10 am / <u>Email this</u> »

| 6 | 19 |

<u>Like</u>    15 people like this.

« <u>Previous story</u>
<u>Want Something Super Fun And FREE To Do Halloween Weekend?</u>
<u>Next story</u> »
<u>Kanye Censored And Not Happy About It</u>

# B a l e s t r i e r e   F a r i e l l o

225 Broadway, Suite 2900
New York, NY 10007
www.balestriere.net

Sanchez, Hilda

Date: 12/15/2010

Regarding:    Sanchez v. Uptown Productions, Inc.

### *Expenses Incurred*

| Start Date | Description | Charges |
|---|---|---|
| 8/25/2010 | Late night transportation - to meeting. | $13.90 |
| 8/25/2010 | Late night transportation - from meeting. | $15.84 |
| 8/25/2010 | Meals while discussing case with entertainment attorney. | $71.00 |
| 8/31/2010 | Meals while discussing and/or working on case, meeting with of-counsel. | $125.74 |
| 9/13/2010 | Meals while discussing and/or working on case. | $55.80 |
| 9/16/2010 | Meals while discussing and/or working on case. | $59.50 |
| 9/21/2010 | Meals while discussing and/or working on case. | $18.00 |
| 9/21/2010 | Meals while discussing and/or working on case. | $36.27 |
| 9/28/2010 | Meals while discussing and/or working on case. | $50.28 |
| 9/30/2010 | Westlaw research charge, 2010-09 | $100.89 |
| 10/05/2010 | Late night transportation. | $13.37 |
| 10/11/2010 | Meals while discussing and/or working on case. | $50.09 |
| 10/12/2010 | PACER research charge 2010-09 | $5.36 |
| 10/14/2010 | Meals while discussing and/or working on case. | $22.49 |
| 10/14/2010 | Late night transportation. | $18.37 |
| 10/15/2010 | Postage: Fed Ex of letter and complaint to AFTRA | $12.14 |
| 10/18/2010 | Meals while discussing and/or working on case. | $27.86 |
| 10/19/2010 | Meals while discussing and/or working on case. | $19.55 |
| 10/19/2010 | Meals while discussing and/or working on case. | $39.10 |
| 10/19/2010 | Meals while discussing and/or working on case. | $6.53 |
| 10/20/2010 | Meals while discussing and/or working on case. | $29.00 |
| 10/26/2010 | Meals while discussing and/or working on case. | $20.09 |
| 10/26/2010 | Late night transportation. | $13.50 |
| 10/27/2010 | Postage: Letter to Judge Griesa | $0.88 |
| 10/31/2010 | Westlaw research charge 2010-10 | $269.70 |
| 11/03/2010 | Late night transportation. | $11.88 |
| 11/03/2010 | Late night cab. | $16.70 |
| 11/03/2010 | Meals while discussing and/or working on case. | $31.00 |
| 11/04/2010 | Meals while discussing and/or working on case. | $29.89 |

Balestriere Fariello
Page No.:    2

| | | |
|---|---|---:|
| 11/04/2010 | Meals while discussing and/or working on case. | $38.96 |
| 11/04/2010 | Service of Complaint and three subpoenas. | $385.00 |
| 11/05/2010 | Meals while discussing and/or working on case. | $15.73 |
| 11/09/2010 | PACER research charge 10/2010 | $5.52 |
| 11/12/2010 | Meals while discussing and/or working on case. | $20.00 |
| 11/14/2010 | Meals while discussing and/or working on case. | $26.41 |
| 11/15/2010 | Messanger settlement documents to opposing counsel | $15.00 |
| 11/19/2010 | Messenger service to Shearman and Sterling - Stipulation | $16.00 |
| 11/22/2010 | Letter to CESD Counsel | $4.90 |
| 11/28/2010 | Meals while discussing and/or working on case. | $26.45 |
| 11/30/2010 | Meals while discussing and/or working on case, dated 2010-10-31. | $27.55 |
| 11/30/2010 | Westlaw research charge: November 2010 | $101.47 |
| 11/30/2010 | Meals while discussing and/or working on case, dated 2010-10-20. | $11.41 |
| 12/08/2010 | Postage: Letter to Kauff re: destroy docs | $0.44 |
| 12/13/2010 | Meals while discussing and/or working on case - split 2010-11 (YC), meeting with of-counsel. | $61.25 |
| 12/13/2010 | Meals while discussing and/or working on case - split 2010-11 (YC), meeting with of-counsel. | $103.75 |
| 12/14/2010 | Consulting Fee - Bill Issued 10/18/2010 - Laura Murray | $1,500.00 |
| 12/15/2010 | PACER research charge 2010-11 | $2.48 |

| | |
|---|---:|
| Total New Charges | $3,547.04 |
| Previous Balance | $0.00 |
| Payment | $-1,000.00 |
| Total Payments and Credits | $-1,000.00 |
| Balance Due | $2,547.04 |

Fee schedule:
$10,000 August 2010, received 2010-08-11 (Check 163)
$4,000 September 2010, received 2010-08-26 (Check 165)
$3,000 October 2010, received 2010-09-15 (Check 169)
-----------
$17,000 total fees paid

Client Trust Account:
$1,000 Orig. Balance for Expenses

XXXXXXXXXX , Total settlement

EXHIBIT G

XXXXXXXXX First installment received, 2010-12-09
XXXXXXXXX Firm's Success Fee
 - $17,000.00, Credit for fees paid by client
 + $2,547.04, Balance for expenses incurred
 --------------------
$XXXXXX, Total due to firm

$34,248.15, Current amount due to client

# BALESTRIERE FARIELLO

225 Broadway, Suite 2900
New York, NY 10007
www.balestriere.net

Sanchez, Hilda                                                      Date: 1/07/2011
XXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXX

Regarding:   Sanchez v. Uptown Productions, Inc.

### Services Rendered

| Date | Staff | Description | Hours | Rate | Charges |
|------|-------|-------------|-------|------|---------|
| 12/19/2010 | JGB | Phone calls with accountant; review of earlier settlement agreement; follow up with case team re: tax issues | 2.40 | $755.00 | $1,812.00 |
| 12/20/2010 | AJC | Read emails, met with JGB and LCS, reviewed CESD settlement agreement and sent follow up emails | 1.10 | $280.00 | $308.00 |
| 12/20/2010 | AJC | Met with JGB to discuss settlement. Sent follow up emails and agreement. | 0.40 | $280.00 | $112.00 |
| 12/20/2010 | AJC | Sent dated agreement to opposing counsel. | 0.20 | $280.00 | $56.00 |
| 12/20/2010 | JGB | Review settlement agreement; review communications with AFTRA; follow up with accountant and case team re: tax issue | 1.40 | $755.00 | $1,057.00 |
| 12/20/2010 | LCS | Enter phone notes. Discuss settlement. | 0.70 | $240.00 | $168.00 |
| 12/21/2010 | AJC | Discussed tax issues with accountant. Reviewed agreements and sent emails to clarify checks, etc. | 0.70 | $280.00 | $196.00 |
| 12/21/2010 | AJC | Met with LCS and JGB to discuss tax issues.  Sent follow-up emails. | 0.20 | $280.00 | $56.00 |
| 12/21/2010 | AJC | Attached signature page to final PDF Settlement agreement.  Read and sent emails | 0.30 | $280.00 | $84.00 |

EXHIBIT G

| 12/21/2010 | JGB | E-mails to and from Farber; discuss with case team | 0.70 | $755.00 | $528.50 |
| 12/22/2010 | JGB | Discuss with compliance lawyer audit procedure and general next steps | 1.30 | $755.00 | $981.50 |
| 12/22/2010 | JGB | Review tax letter of Farber; review earlier communications | 0.80 | $755.00 | $604.00 |
| 12/23/2010 | JDA | Enter phone note. | 0.10 | $210.00 | $21.00 |
| 12/23/2010 | LCS | Finish monthly update.  Review emails. PA save documents. | 0.90 | $240.00 | $216.00 |
| 12/27/2010 | JGB | Phone call with Stewart Farber; e-mails to and from Farber; e-mails to and from client and case team; phone call with Farber and Kauff; separate calls with Kauff; follow up calls and e-mails with everyone; e-mails to and from lender; review of underlying documents | 2.20 | $755.00 | $1,661.00 |
| 12/27/2010 | LCS | Review emails. Call with JGB re: Tax issues. | 0.40 | $240.00 | $96.00 |
| 12/28/2010 | JGB | Discuss tactical concerns, both with taxes and audit issues, with litigator | 1.80 | $755.00 | $1,359.00 |
| 12/29/2010 | JGB | E-mails to and from client re: tax and trust matters | 0.30 | $755.00 | $226.50 |
| 1/03/2011 | AJC | Spoke with Megan Capuano from AFTRA.  Sent emails to JGB and AFTRA. | 0.30 | $280.00 | $84.00 |
| 1/03/2011 | AJC | Met with JGB and LCS to discuss tax meetings and steps moving forward | 0.20 | $280.00 | $56.00 |
| 1/03/2011 | JGB | Discuss series of engagement and client concerns with chief of staff, internal staff, and outside lawyer | 2.10 | $755.00 | $1,585.50 |
| 1/03/2011 | LCS | Enter phone notes.  Case team meeting. Sort emails. Review invoices. | 1.40 | $240.00 | $336.00 |
| 1/05/2011 | LCS | Meet re: client management. Sort and review documents. | 0.60 | $240.00 | $144.00 |
| 1/06/2011 | AJC | Followed up with CESD | 0.10 | $280.00 | $28.00 |

| | | | | | |
|---|---|---|---|---|---|
| 1/06/2011 | LCS | Meeting re: client emails. | 0.40 | $240.00 | $96.00 |
| 1/07/2011 | AJC | Followed up with CESD and Opposing cousel re: CESD payment and reviewed settlement agreement | 0.40 | $280.00 | $112.00 |

Total Charges                                                                                     $12,136.86

### Staff Summary

| Name | Hours | Rate |
|---|---|---|
| Angie Jean Chrysler | 3.90 | $280.00 |
| Jessica Acosta | 0.10 | $210.00 |
| John Balestriere | 13.00 | $755.00 |
| Laura C Sayler | 4.40 | $240.00 |

NICKELODEON:
Fee schedule:
$10,000 August 2010, received 2010-08-11 (Check 163)
$4,000 September 2010, received 2010-08-26 (Check 165)
$3,000 October 2010, received 2010-09-15 (Check 169)
-----------
$17,000 total fees paid

Client Trust Account:
$1,000 Orig. Balance for Expenses

XXXXXXXXXXX Total settlement
XXXXXXXXXXX First installment received, 2010-12-09
XXXXXXXX3, Firm's Success Fee
- $17,000.00, Credit for fees paid by client
+ $2,547.04, Balance for expenses (8/25/10 - 12/15/10)
--------------------
$178,910.77, Total due to firm
$34,248.15, Amount paid to client, 2010-12-16

----------------------------------------------

CESD:
XXXXXXXXXX First Settlement Installment*
XXXXXXXXXX, Firm's Success Fee
+ $152.42, Balance for expenses (12/16/10 - 01/06/11)
--------------------
$22,652.42, Total due to firm
$37,347.58, Current amount due to client (CESD)

* We are still waiting on further settlement proceeds from
CESD.

EXHIBIT G



**JOHN G. BALESTRIERE**
BALESTRIERE FARIELLO
225 Broadway, Suite 2900
New York, NY 10007
Phone: +1.212.374.5401
Cell:    +1.917.318.3844
Fax:     +1.212.208.2613
john.balestriere@balestriere.net
www.balestriere.net

January 18, 2011

**VIA FIRST CLASS MAIL AND EMAIL (bherman@morganlewis.com)**
Brian A. Herman, Esq.
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0600

> Re: *Caitlin Sanchez, performing as "Dora the Explorer" v. MTV Networks, a division of Viacom, International, Inc., d/b/a Nickelodeon, and Nickelodeon/Viacom Consumer Products, Inc.,* (No. 10 Civ. 7854)

Brian:

As you know, our firm was formerly counsel of record for Plaintiff Caitlin Sanchez ("Caitlin" or "Plaintiff") in the matter *Caitlin Sanchez, performing as "Dora the Explorer" v. MTV Networks, a division of Viacom, International, Inc., d/b/a Nickelodeon, and Nickelodeon/Viacom Consumer Products, Inc*, as well as any dispute involving your client related to the facts at issue in that action (collectively, "the Matter"). I'm writing to you to make clear that any payments your client, Cunningham-Escott-Slevin-Doherty Talent Agency ("CESD"), makes or has made to Sanchez must be sent to our firm pursuant to the Settlement Agreement dated December 20, 2010 ("the Settlement Agreement").

As you know, my clients, including Caitlin, and her parents, Hilda and Kevin Sanchez (collectively, "the Sanchez family"), fired our firm by not later than January 11, 2011. Even the Sanchez family does not claim that they terminated us for cause – indeed, there would be no cause for termination – and I am, in fact, unaware of why they fired our firm. In any event, Caitlin's parents apparently have since requested that all payments from your client be sent directly to the Sanchez family, contrary to the Settlement Agreement. I write to notice you of our intention to seek all fees due our firm from the Sanchez family, including, but not limited to, any fees related to any past or future payments to Caitlin related to the Matter.

Pursuant to our engagement letter with the Sanchez family, our firm is due fees calculated as a portion of any payments from CESD to Sanchez. Given this, if your client participates in any payment of funds to the Sanchez family related in any way to the Matter without our involvement and consent you or your client may expose yourself to tort liability.



Your firm, representing CESD in its settlement with the Sanchez family, should give Balestriere Fariello notice of any payments made to the Sanchez family. If any funds are disbursed to the Sanchez family without our knowledge and participation, you and/or your client may be liable for conversion and/or tortious interference with business relations. *See, e.g., Wingate, Russotti & Shapiro, LLP v. Friedman, Khafif & Associates*, 41 A.D.3d 367 (2007); *Employer's Fire Ins. Co. v. Cotton*, 245 N.Y. 102, 105 (1927); *Lama Holding Co. v. Smith Barney*, 88 NY 2d 413, 424 (1996).

I wish to be clear that I do not believe that you or your client has done anything inappropriate with regards to the Sanchez's obligation to pay my firm. However, I also must be clear about what I believe your obligations are, and what our intentions are. We shall take any steps necessary to protect our interests, while reserving all rights, and acting consistent with our ethical obligations.

Please feel free to contact me if you have any further questions or concerns. I do not wish to make things difficult for you or your client and understand that you did not create this thorny situation, but I am obliged to give you this notice.

Thank you for your attention to this important matter.

Respectfully,

John G. Balestriere

cc:     Ken Slevin (via email kslevin@cesdtalent.com and via U.S. Mail: CESD Talent, 257
            Park Ave S # 900, New York, NY 10010-7304)
         Angie Chrysler (via email: angie.chrysler@balestriere.net)
         Laura Sayler (via email: laura.sayler@balestriere.net)

EXHIBIT H

Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
Tel: 212.309.6000
Fax: 212.309.6001
www.morganlewis.com

# Morgan Lewis
C O U N S E L O R S   A T   L A W

**Brian A. Herman**
Partner
212.309.6909
bherman@morganlewis.com

January 25, 2011

John G. Balestriere, Esq.
Balestriere Fariello
225 Broadway
Suite 2900
New York, NY 10007

Re:     CESD/Sanchez

Dear John:

I write in response to your letter dated January 18, 2011.

On December 20, 2010, the Sanchez Family and Cunningham Escott Slevin Doherty ("CESD") entered into a confidential Settlement Agreement. The Settlement Agreement defines the Parties as the Sanchez Family and CESD and, importantly, neither you nor your law firm is a Party to the Settlement Agreement.

In the Settlement Agreement, the Sanchez Family designated the Balestriere PLLC account as the recipient of payments of future Commissions. As you know, they now have instructed CESD to direct any future payments to their attention, and CESD and the Sanchez Family are amending the Settlement Agreement in accordance with the terms of the Settlement Agreement to reflect this new payment instruction.

Please note that CESD has received payments in the amount of $11634.14 from Team Services and will forward those payment directly to Caitlin Sanchez in accordance with the instructions provided by the Sanchez Family. CESD intends to do the same with respect to the anticipated payment from UPI and, as a courtesy, will advise you when that payment is made.

In your letter, you suggest that you may commence legal proceedings against CESD and/or Morgan Lewis. Such an action would be both unwarranted and improper as neither CESD nor Morgan Lewis has anything to do with the fee dispute between you and the Sanchez Family. We urge you to resolve this dispute with your former client without further litigation or costs to any the parties. However, please understand that it you do commence an action against CESD and/or



John G. Balestriere, Esq.
January 25, 2011
Page 2


Morgan Lewis, we will vigorously defend the action and will seek reimbursement of our fees and costs when we win.

Sincerely,

Brian A. Herman


c:      Hilda Sanchez

EXHIBIT H

**EXHIBIT I**

from **John G. Balestriere** john.balestriere@balestriere.net
to Hilda Sanchez <xxxaithnsanshex@gmaitx.com>
cc Laura Sayler <laura.sayler@balestriere.net>,
   Angie Chrysler <angie.chrysler@balestriere.net>,
   Stewart Farber <stewartf@farbercpa.com>,
   Jason Farber <jasonf@farbercpa.com>
date Mon, Dec 27, 2010 at 10:49 AM
subject IMPORTANT - please respond as soon as you can

Hilda and Kevin:

Defense counsel Jerry Kauff is looking to see if he can get his client to reverse the payment and then make a new payment where our firm's fees will go directly to us, which would result in a better tax benefit to you. However, for that to happen, we'd need you to pay to us the net settlement you received last week, then we'd need to pay the total net received back to Nickolodeon, after which they'd then make two payments, one payable to our firm, the other payable to you/Caitlin, for the same total amount.

The only problem here is that we don't have the net fee any longer in our operating account. However, we did receive the CESD initial payment of (REDACTED), but we'd still be something like $(REDACTED) short. I figure you do not have that kind of money available for a short term loan, but confirm that. If you don't, I'll see what I can do but I must be blunt that since it is a dead week I'm not sure what is possible and that even if something were, it could cost a few thousand in finance charges (even if that cost would be dwarfed by the end savings here).

Stewart and Jason - if you have any ideas re how to get such short term capital, please advise.

I'm out of pocket for a little bit then available all afternoon. Please advise as soon as you can.

Thanks,
John

John G. Balestriere
BALESTRIERE FARIELLO

**EXHIBIT I**